UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x       Civil Action No.
KURTIN PLLC and OWEN D. KURTIN,
                                    Plaintiffs,

            v.                                                **VERIFIED COMPLAINT**

ICON CAPITAL RESERVE S.A. and
J. BRADLEY HALL,
                                    Defendants.
------------------------------------------------------x

     Plaintiffs KURTIN PLLC and OWEN D. KURTIN, by their attorneys, Olasov, LLP, for their verified complaint against defendants ICON CAPITAL RESERVE S.A. and J. BRADLEY HALL, respectfully allege:

THE PARTIES

     1.    Plaintiff KURTIN PLLC ("Kurtin Law") is a New York professional limited liability company, formed in 2008, that has been continuously and exclusively engaged in the practice of law since its formation.  Kurtin Law maintains its principal place of business at 575 Lexington Avenue, Floor 14, New York, New York 10022.

     2.    Plaintiff OWEN D. KURTIN ("Kurtin") is an attorney at law admitted to the New York Bar in 1986 and engaged in the practice of law continuously since his admission.  Kurtin is a U.S. citizen and resident of the County and State of New York.  Kurtin owns and manages Kurtin Law.

     3.    Upon information and belief, defendant ICON CAPITAL RESERVE S.A. ("ICON") is a Nevis corporation formed on or about February 16, 2015 and having both its administrative office and its registered office at Suite 5, Horsford's Business Centre, Long Point Road, Charlestown, Nevis, West Indies.  ICON lists in publicly available materials other offices or addresses outside the United States, but lists and maintains no such presence within the United

States.  ICON holds itself out as principally engaged in gold trading and as the developer of the AUREAL™ (the "AUREAL"), a digital coin or token, or cryptocurrency, in circulation since about 2013, in which each AUREAL is pegged to the price of one (1) gram of gold, fluctuating in value with the price of gold.

4.     Upon information and belief, defendant J. BRADLEY HALL ("Hall") is the founder of ICON and is a Canadian national or citizen and a resident or citizen of Dubai, United Arab Emirates.  According to records provided by Hall to plaintiffs in connection with the preparation of a private placement memorandum for the offering of securities to be issued by ICON, Hall is the sole director and officer of ICON.  Hall controls, directly or through a corporation that functions as a family holding company, 73,800,000, or 73.92%, of its 99,835,748 issued and outstanding shares.  None of the 47 other shareholders of ICON hold as much as 5% of ICON's equity.  On the basis that, individually and collectively, they exercised no control of any kind over ICON and that Hall exercised total control over ICON, Hall declined to identify, even to plaintiffs as their attorneys, any of the 47 other shareholders, the amounts of their holdings and the basis or consideration for which each such other shareholder acquired an interest in ICON. Under the By-Laws of ICON as disclosed to plaintiffs, as its sole director, Hall had full authority to direct the affairs of and to bind ICON.  No other person is understood to have such authority in respect of ICON.

5.     At the time of execution of the Engagement Letter, as defined and described below, Kurtin offered to work with other personnel at ICON in connection with the performance of the services called for thereunder.  Hall directed Kurtin that he was only person at ICON with whom Kurtin could deal.

6.     ICON is a legal alter ego for Hall.

7.     By reason of the foregoing and his actual direction of all of the affairs of ICON in connection with the matters complained of herein, Hall is jointly and severally liable with ICON for all of the relief, including but not limited to, monetary damages sought by plaintiffs hereunder.

JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332 in that there is complete diversity of citizenship between plaintiffs Kurtin Law and Kurtin and defendants ICON and Hall, and the amount or value in controversy in this action exceeds the sum of $75,000, exclusive of interest and costs.

9.     Defendants ICON and Hall are subject to the personal jurisdiction of this Court pursuant to CPLR §302(a)(1) in that they have transacted business with Kurtin Law and Kurtin within the City and State of New York, among other related matters, by soliciting the legal representation of Kurtin Law and Kurtin to provide legal services within the City and State of New York, the execution and delivery of a contract governed by New York law and executed, delivered and performed in New York for the provision of legal services in New York and their acceptance of such services rendered in New York, all as set forth in this Complaint.

10.     Venue is proper in this District pursuant to 28 U.S.C.A. §1391(b)(2) or (3) in that a substantial part of the events giving rise to the claims occurred in this District or, in the alternative, that there is no other District in which the defendants may be found.

ALLEGATIONS COMMON TO ALL CLAIMS

<u>Initial Contacts</u>.

11.     On or about June 30, 2024, Hall, on his own behalf and that of ICON, initiated contact with Kurtin in New York, requesting an initial legal consultation about a cryptocurrency project.  The parties agreed to speak on July 4, 2024.

12.    In the July 4, 2024 call, Hall recounted the basic history of ICON and the AUREAL to Kurtin, and told him that he was seeking an expanded role and distribution of the AUREAL and needed to raise money for several projects to do so. Hall explained that he had read one or more articles that Kurtin had written about cryptocurrencies and the State of Wyoming's role in developing digital asset statutes adapted for the issuance of cryptocurrencies and believed Kurtin could help him bring those projects to fruition.

13.    The July 4, 2024 call ended inconclusively, with Hall and Kurtin agreeing to stay in touch.

Subsequent Contacts.

14.    Over the next several months, Hall and Kurtin continued in sporadic contact with one another. Kurtin put Hall on the Kurtin Law emailing list. Hall expressed concern about the confidentiality of communications, and he and Kurtin established a WhatsApp encrypted chat to facilitate confidential communications by text and audio calls.

15.    In or about March 2025, ICON and Hall began sending Kurtin, and Kurtin commented on, a series of "ICON Opportunities" documents intended to market and sell the AUREAL in greater volume. In the ICON Opportunities documents, which ICON and Hall sent to Kurtin in March, May, June and July 2025 versions, ICON proposed an evolving series of six (6) securities transactions involving ICON-issued AUREALS consisting of:

>    a.    a proposed private placement offering of wrapped units of ICON equity and AUREALS primarily into the U.S. capital markets for the purpose of raising working capital for ICON and substantially increasing the number of AUREALS in circulation, in an aggregate offering amount of $927,000,000 in the final July 2025 version;

b.      an offering of AUREALS primarily into the German, Austrian, Swiss and Lichtenstein institutional capital markets in an aggregate offering amount of CHF (Swiss Franc) 1 billion+ in the final July 2025 version;

c.      a USD $300,000,000 AU DORE Credit Facility/Bond intended to lock in gold supply agreements to facilitate increasing AUREAL reserves;

d.      a Special Purpose Acquisition Company ("SPAC") public offering to raise approximately $300,000,000 to buy a controlling interest in a small Swiss bank and a portfolio of banking licenses in Singapore, Hong Kong, Africa, Wyoming and Latin America/Mexico;

e.      a $12 million Equity/Convertible Debt Offering to develop a new agentic, AI-powered digital wallet; and

f.      a $9 million Equity/Convertible Debt Offering to develop "AUVAULT," for intergenerational creators and custodians of wealth who demand storage of physical gold bars in hardened vaults in places such as Shanghai, Dubai, Singapore, Hong Kong and Switzerland.

In this Complaint the documents describing the terms of these six contemplated offerings are sometimes referred to as the "ICON Opportunities" or, collectively, as the "ICON Transactions" or individually as an "ICON Transaction."

16.      Kurtin provided Hall and ICON with substantive comments on the evolving series of ICON Opportunities documents, including detailed assessments of all six ICON Transactions. Hall generally adopted Kurtin's suggestions and thanked and complimented him for making them. For one example, Kurtin suggested that the ICON Opportunities drop the prior versions' proposal to offer "SAFE Notes" as a security as being a relatively new creation of the Silicon Valley venture capital community lacking traditional attributes of debt and convertible debt securities that would

not be readily accepted by investors in this ICON Transaction.  ICON and Hall thanked Kurtin for his suggestion and adopted it, eliminating the use of SAFE Notes in the ICON Opportunities.  In another case, Kurtin recommended that another ICON Opportunity, the SPAC, be increased from an aggregate offering amount of $60,000,000 because that amount would be insufficient to acquire the banks and bank licenses that were the intended use of proceeds and would also likely be insufficient to interest institutional SPAC investors.  Hall agreed and increased the proposed SPAC offering amount in ICON Opportunity to $300,000,000.  In a third case, Kurtin suggested that the now-$927,000,000 private placement be split into two tranches of offerings, with a first tranche of up to $50,000,000 intended to get some initial capital into ICON, to be offered in the form of a convertible bridge loan with notes convertible into units of ICON equity and AUREALS at a discount to other investors at the time of a first closing of the second tranche and main offering. Hall agreed and the July ICON Opportunity document reflected Kurtin's input and suggestions.

The June 3, 2025 Engagement Letter.

17.    On or about June 3, 2025, Kurtin sent Hall a Kurtin Law engagement and retainer letter to memorialize the results of their discussions of the terms of the engagement of Kurtin Law as ICON's attorneys for the full series of six transactions described in the then-current version of the ICON Opportunities document (the "Engagement Letter").  Hall executed the Engagement Letter for ICON, initialed each page and returned a fully executed copy the next day.  A true and complete copy of the fully-executed Engagement Letter is attached to this Verified Complaint as Exhibit A and its terms are incorporated by reference as if set forth in full.  A copy of the May 2025 iteration of the ICON Opportunities document referenced in the Engagement Letter is attached to this Verified Complaint as Exhibit B and its terms are incorporated by reference as if set forth in full.

18.    The Engagement Letter sets forth the following provisions concerning the scope of legal services to be provided by Kurtin Law and Kurtin:

Scope of Engagement: You have engaged Us initially to counsel You in connection with a proposed series of offerings, private and public, of equity in the Company, debt or digital token products called AUREALS that You have developed and pegged to the price of gold, as it may change on spot markets from time to time at the rate of one (1) AUREAL = one (1) gram of gold, as well as units of AUREALS and other equity or debt securities. The said offerings and other initiatives, which are subject to change and modification, are currently set forth in a document You have sent us styled "ICON Opportunities May 2025," and are referred to in this Letter collectively as the "ICON Transactions" (Engagement Letter, p. 1).

19.    The Engagement Letter specified two forms of compensation. The first was a non-contingent retainer set at US$50,000 to be funded initially by a deposit of AUREALS pegged at the market rate of gold at the time of funding into a digital wallet account under the sole control of Kurtin Law, with the right of ICON and Hall to convert the AUREALS into US dollars in its discretion within the first 90 days after funding and the right of Kurtin Law and Kurtin in its discretion to compel such conversion after the expiration of 90 days. The 90-day lock-up, which delayed Kurtin Law's access to the retainer as available funds in U.S. dollars, was requested by Hall. By this mechanism ICON and Hall reserved the right to limit or avoid their exposure to market increases in AUREALS during the initial period, and Kurtin Law and Kurtin reserved the contractual right to limit their exposure to market declines in AUREALS after 90 days and to facilitate the use of the retainer as earned income by compelling ICON and Hall to effectuate the conversion of AUREALS into U.S. dollars in the account maintained by Kurtin Law.

20.    To this end, the Engagement Letter provided, in pertinent part, as follows:

Retainer. You have agreed to provide Us with a retainer of the value of USD $50,000 in AUREALS, fixed at today's rate of USD $108.58 per gram, or 460.49 AUREALS, for which you will establish an ICON non-custodial digital wallet for Us in the name of "Kurtin PLLC" (the "Kurtin PLLC Digital Wallet") for Our fees and disbursements contemporaneously with Your execution and return

of this Letter. The Kurtin PLLC Digital Wallet will also be the repository for any AUREALS paid to Us as Success Fees hereunder and may be withdrawn from only by Owen D. Kurtin, the undersigned and Our founding member. This retainer is subject to redemption by Us in U.S. dollars at any time after ninety (90) days from today's date at the then-current value of AUREALS to the U.S. dollar (Engagement Letter p. 3).

21. The second form of compensation under the Engagement Letter was contingent compensation set at 1.0% of the net closing proceeds or capital raised, as applicable, of any consummated transaction. The Engagement Letter made it clear that such contingent compensation was earned whether the investors or underwriters were procured by ICON or Hall themselves, unrelated third party investment bankers, underwriters or broker-dealers or persons identified by ICON or Hall or introduced by Kurtin Law or Kurtin.

22. The Engagement Letter spelled out the Success Fee compensation of Kurtin Law and Kurtin, as follows:

> SPECIAL SUCCESS FEE ARRANGEMENT. IN LIEU OF AN HOURLY RATE-BASED FEE, FLAT FEE, OR OTHER FEE BASIS FOR OUR REPRESENTATION, YOU HAVE REQUESTED, AND WE HAVE AGREED, TO THE FOLLOWING SUCCESS FEE BASIS, SUBJECT [TO] THE TERMS AND CONDITIONS STATED HEREIN. UPON THE CLOSING, OR ANY OF MULTIPLE CLOSINGS OF ANY OF THE ICON TRANSACTIONS, WE WILL BE PAID, AT SUCH CLOSING OR CLOSINGS (WHENEVER OCCURRING), FROM THE PROCEEDS OF PAYMENT OR PAYMENTS, IN AUREALS OR SUCH OTHER DERIVATIVE PRODUCT OR FIAT CURRENCY TO WHICH WE BOTH MUTUALLY AGREE AND WHICH CONSTITUTES THE PROCEEDS OF SUCH CLOSING OR CLOSINGS, AN AMOUNT EQUAL TO **ONE PERCENT (1.0%)** OF THE VALUE OF THE CLOSING PROCEEDS, OR THE CAPITAL RAISED, AS THE CASE MAY BE, AT THAT CLOSING OR CLOSINGS (THE "SUCCESS FEE"). THE SUCCESS FEE SHALL BE CONTINGENT ONLY ON THE CLOSING OR CLOSINGS TAKING PLACE, AND NOT ON ANY OTHER EVENTUALITIES, WHETHER RELATED TO OUR REPRESENTATION OF YOU OR OTHERWISE. IF NO SUCH CLOSING OR CLOSINGS OCCUR, NO SUCCESS FEE WILL BE DUE TO US IN CONNECTION WITH THAT ICON TRANSACTION, WITHOUT PREJUDICE TO SUCCESS FEES

THAT ARE OR MAY BECOME DUE ON OTHER ICON
TRANSACTIONS (Engagement Letter pp. 1-2, CAPS and
**boldface** in original).

YOU FURTHER ACKNOWLEDGE AND SPECIFICALLY
AGREE, THAT FOR ANY GIVEN CLOSING OR CLOSINGS
FOR WHICH THE SUCCESS FEE IS DUE, IT SHALL BE NO
EXCUSE OR DEFENSE TO PAYMENT OF THE SUCCESS FEE
THAT OUR HOURLY FEES OR OTHER ALTERNATIVE FEES
FOR THE SAME TRANSACTION WOULD HAVE BEEN LESS,
EVEN MATERIALLY LESS, THAN THE SUCCESS FEE WILL
BE IN THAT CASE. IT IS SPECIFICALLY AGREED
BETWEEN US THAT ANY SUCH AMOUNT OF THE
SUCCESS FEE ABOVE AND BEYOND WHAT AN HOURLY
RATE OR OTHER ALTERNATIVE FEE WOULD HAVE BEEN
IS CONSIDERATION FOR OUR HAVING ACCEPTED THE
RISK THAT NO CLOSING OR CLOSINGS MIGHT OCCUR, AS
WELL AS TO ACCEPTING PAYMENT IN AUREALS OR
OTHER DERIVATIVE CURRENCY, AND FOR YOU IN NOT
BEING OBLIGATED FOR SUCH HOURLY RATE OR OTHER
ALTERNATIVE FEE SHOULD NO CLOSING OR CLOSINGS
OCCUR, OR TO MAKE PAYMENTS OF SUCH HOURLY RATE
OR OTHER ALTERNATIVE FEES PRIOR TO A CLOSING OR
CLOSINGS. YOU FURTHER AGREE, PRIOR TO ANY
CLOSING OR CLOSINGS TO EXECUTE ANY DOCUMENTS
REASONABLY NECESSARY TO THE PURCHASER,
ESCROW AGENT, OR OTHER STAKEHOLDER'S
SATISFACTION TO ALLOW SUCH PERSON OR ENTITY TO
PAY THE SUCCESS FEE TO US AT ANY SUCH CLOSING OR
CLOSINGS FROM THE CLOSING PROCEEDS (Engagement
Letter p. 2, CAPS in original).

23.    The Engagement Letter treated the engagement of other professionals by ICON and

Hall, including the retention of investment bankers, underwriters and broker-dealers as

disbursements to be separately paid (or reimbursed) by ICON and Hall:

> <u>Disbursements</u>. …We will bill You for certain, but not all of, Our
> disbursements and out-of-pocket expenses made or incurred on the
> Company's behalf in connection with Our representation....In the
> case of material disbursements, such as for frequent travel or for
> outside consultants, including attorneys outside the Firm in the U.S.
> and abroad, accountants, investment bankers, broker-dealers,
> placement agents, valuation experts, intellectual property reviewers,
> translators and others (the engagement of which will be subject to
> your prior written approval), We may ask You to either engage or
> pay such disbursements directly, or to establish a separate

"disbursement retainer" to fund such disbursements…(Engagement
Letter p. 2 - 3).

24.     The Engagement Letter expressly provided that the retainer was subject only to the
90-day lock-up and that redemption of the retainer in U.S. dollars and payment of any
disbursements were outside the scope of the Success Fee arrangement and not contingent upon the
consummation or closing of any ICON Transactions.

> NOTWITHSTANDING THE SUCCESS FEE ARRANGEMENT
> STATED HEREIN, ALL DISBURSEMENTS AND PAYMENT
> OF THE RETAINER, BOTH AS SET FORTH BELOW, SHALL
> BE DUE (Engagement Letter p. 2, CAPS in original).

25.     Immediately after executing and returning the Engagement Letter, Kurtin, with
instructions from ICON and Hall, created the Kurtin PLLC Digital Wallet, and, on information
and belief, funded it on June 5, 2025 with the agreed-upon 460.49 AUREALS retainer.

Post-Engagement Letter Activity.

26.     Immediately after the execution of the Engagement Letter and the apparent deposit
of the AUREALS retainer in the Kurtin PLLC Digital Wallet, Kurtin Law and Kurtin went to work
on structuring and preparing documentation for the ICON Transactions.  The parties agreed to
frontload the $927,000,000 private placement ICON Transaction, also informally called by them
"Project 1," because (i) it was the largest purely U.S. dollar offering of the ICON Opportunities;
(ii) it would be structured, as described above, with a $50,000,000 convertible debt bridge loan
first tranche to get early capital into ICON; and (iii) by Kurtin's estimation, it could be completed
and put on the market more quickly or efficiently than other larger ICON Opportunities.

27.     Hall and Kurtin maintained their WhatsApp encrypted chat line and arranged to use
it not merely for messaging, but for weekly status voice calls every Friday at 9:00 am EDT, for
which Kurtin produced weekly advance agendas.  Kurtin Law and Kurtin structured Project 1 as a
combined U.S. Securities Act of 1933 Regulation D (for onshore U.S. investors)/Regulation S (for

offshore investors) private placement and began preparation of a Regulation D-compliant private placement memorandum (the "PPM"). The PPM was structured with the $50,000,000 convertible debt bridge loan first tranche and $877,000,000 second tranche to which the parties had agreed. The PPM provided for minimum/maximum investments and multiple closings for both tranches to give ICON maximum flexibility in use of investment funds. Kurtin produced the first draft of the PPM and circulated it to Hall on or about June 16, 2025. The next day, June 17, Hall sent to Kurtin the July 2025 ICON Opportunities version, the last iteration that Kurtin received, which contained Kurtin's suggestions for all of the ICON Transactions to date, and to which the subsequent drafts of the PPM conformed. The parties reviewed the draft, commented, and produced and commented on several more drafts and sub-drafts, culminating in a fifth draft of the PPM that Kurtin circulated to Hall on or about August 10, 2025, an approximately 59 page document fundamentally complete with some open bracket items requiring filling in to finalize, as well as certain disclosure issues to resolve, including in particular the necessity or advisability of disclosures concerning the 47 persons or entities holding in the aggregate a 26.18% minority interest in ICON.

28.     In addition to the PPM, Kurtin produced several more documents for Project 1, including several drafts of three separate documents of the first tranche convertible bridge loan documents: a bridge loan agreement, a convertible bridge loan note, and a set of directors' resolutions for ICON to authorize entering the bridge loan with one or more bridge lenders. Kurtin also produced a Regulation D-compliant subscription document for investors.

29.     Although the PPM and other documents Kurtin produced for ICON were initially drafted for Project 1, Hall and Kurtin discussed several times during their preparation how the documentary work produced for Project 1 would be readily adaptable for all or most of the other ICON Transactions, since the PPM contained the ICON and AUREAL story and qualitative

information and ICON quantitative information.  For example, the $300,000,000 SPAC ICON

Transaction would require a Securities Act Regulation C-compliant registration statement, a more

detailed document than Project No. 1's Regulation D-compliant PPM, but ultimately a U.S.

Securities Act prospectus, and one containing similar quantitative (financial) and qualitative

information.

30.     During the post-Engagement Letter period, and while the preparation of the PPM

and other documents was in progress, the parties began to discuss the placement of the Project 1

securities to investors.  On several occasions, Kurtin urged Hall to hire a third-party investment

banker, broker-dealer, or placement agent to market the ICON securities and pointed out the

provision in the "Disbursements" section of the Engagement Letter quoted above providing for

ICON's employment of such persons.  ICON and Hall did not do so, so far as Kurtin knew.  Hall

asked Kurtin whether he had access to any investors.  Kurtin responded that he sometimes

introduced clients to potential investors or funding sources or placement firms when asked but did

so as a pure value-add or unpaid service to his core offering of legal advice and service.  Kurtin

also cautioned Hall several times that, while he was happy to make such referrals, as a lawyer, his

investment banker and private equity contacts did not expect such investment opportunities, of

such size, to be referred by him.  It would be very unlikely, Kurtin told Hall, for Hall to expect

$927,000,000 or any number close to it to be procured by Kurtin from his investor rolodex and

introductions alone.

31.     On the basis set forth in the preceding paragraph, and with the express approval of

ICON and Hall both before and after the fact, Kurtin made introductions of the ICON

Opportunities by transmitting an iteration of a PowerPoint Pitchdeck describing all of the ICON

Transactions that ICON had prepared and on which Kurtin had commented under cover of a

transmittal email (with multiple telephone calls) to a list of  75 prospective investors, investment

bankers, private equity and venture capital firms and broker-dealers known to Kurtin, whom he believed might be interested in one or more of the ICON Opportunities.  Copies of an exemplar of a transmittal and of the transmitted PowerPoint Pitchdeck are attached as Exhibit C.  Promptly after this case is assigned to a District Court Judge, plaintiffs intend to make a motion to file under seal a copy of the list of the 75 firms and persons to which Kurtin introduced the prospective ICON Opportunities and which Kurtin provided to Hall in the secure online portal Kurtin established for ICON and to be deemed attached as Exhibit D to this Complaint, subject to the Court's approval.  If the motion to file under seal is not granted, plaintiffs will file an amended verified complaint attaching the list as Exhibit D not under seal.

32.     With draft version 5 of the PPM delivered and nearly complete as of August 10, 2025, Kurtin sent Hall a WhatsApp message on or about August 17 stating that he intended to start preparing the CHF 1 Billion+ Swiss Franc offering and U.S. $300,000,000 SPAC registration statement of the ICON Transactions.  Hall responded with a "thumbs up" emoji.

Defendants' Breach and Subsequent Termination of the Engagement Letter.

33.     On or about August 25, 2025, Kurtin communicated with Hall on the WhatsApp chat that the 90-day lockup on the 460.49 AUREALS retainer in the Kurtin PLLC Digital Wallet was due to expire in the first week of September, and that Kurtin wanted to redeem them for U.S. dollars at the then-current rate when the 90 days expired.  Kurtin requested any special instructions needed to convert the AUREALS retainer to dollars and wire them to Kurtin Law's account.  Hall responded that the AUREALS swap would be done as soon as closings occurred in Project 1. Kurtin replied that, unlike Success Fee payments, redemption of the retainer was explicitly made subject only to the expiration of the 90-day lockup in the Engagement Letter.

34.     However, Hall insisted, and stated in a September 1, 2025 WhatsApp message, that he would not redeem the retainer until there were closings in Project 1.

35.     Hall's refusal to cause ICON to redeem the retainer constituted defendants' material breach of the Engagement Letter.

36.     Hall and Kurtin had subsequent WhatsApp text and oral communications relating to the Engagement Letter and its proper construction under applicable New York law.  In one such communication, Hall asserted, for the first time, that he was not obligated to pay the Kurtin Law a Success Fee on any Project 1 or any other ICON Transaction unless Kurtin himself had procured the investor whose investment was being closed.  Kurtin responded that this was not the parties' agreement, that Kurtin Law had been engaged to provide legal services, not to find investors, reminded Hall that any efforts Kurtin or Kurtin Law made to help find investors was a pure value-add and not a formal part of Kurtin Law's services or basis of compensation, and that the Engagement Letter expressly and unambiguously provided for the Success Fee to be paid to Kurtin Law upon any closing in any ICON Transaction irrespective of whether Kurtin or Kurtin Law, or Hall or ICON, or any third party such as an investment banker procured the investor whose investment was the subject of the closing.  Kurtin took Hall through a detailed review of the Engagement Letter's provisions in an effort to salvage the situation.  Hall remained insistent: ICON would not redeem the AUREALS retainer until there were closings in Project 1; and ICON would not pay any Success Fee to Kurtin Law on any ICON Transaction closing unless Kurtin Law or Kurtin was the source of the investor whose investment was being closed.

37.     On September 16, 2025, Hall sent Kurtin a termination letter terminating the services of Kurtin Law and Kurtin under the Engagement Letter (the "Termination Letter").  A copy of the termination letter is attached as Exhibit E.  The Termination Letter did not contain any statement or claim that the termination was for cause. To the contrary, the Termination Letter stated, "We thank you for your efforts to date…."

38.    Neither ICON nor Hall had, or claimed, any cause to terminate the legal services of Kurtin Law or Kurtin.

39.    ICON and Hall terminated the Engagement Letter in disregard of their continuing duties under the Engagement Letter after termination, in material breach of their implied duty of good faith and fair dealing and in bad faith.

40.    By its express terms the Engagement Letter is governed by New York.  In accordance with New York law applicable to the engagement of New York lawyers the Engagement Letter confirmed the right of ICON and Hall as clients to terminate the provision of services of Kurtin Law and Kurtin.  The Engagement Letter provides, in pertinent part:

> You have the right to terminate this engagement, by written notice, at any time, subject to the vesting of the right to Success Fees from any ICON Transaction that We were working on at the time of termination, even if closing after such termination (Engagement Letter p. 3).

> Governing Law.  The laws of the State of New York shall govern the interpretation of this agreement, including all rules or codes of ethics which apply to the provision of legal services in New York (Engagement Letter, p.4).

41.    Under applicable New York law, in connection with a client's termination of an engagement that provides for contingent compensation for legal services, the law firm and lawyer can elect for the payment of their compensation on an immediate and non-contingent basis for their services in *quantum meruit,* or, in the alternative, can await the final outcome of the event or events on whose resolution compensation had been made contingent.

42.    By letter dated September 25, 2025 (the "Election Notice") Kurtin Law and Kurtin gave ICON and Hall notice that, in light of their termination, they had elected to be paid for their services on an immediate and non-contingent basis.  The Election Notice also gave ICON and Hall notice of the assertion of a charging lien on the proceeds of ICON Transactions within the scope

of the Engagement Letter.  A copy of the Election Notice is attached to this Complaint as Exhibit E and its terms are incorporated by reference as if set forth in full.

43.    ICON and Hall acknowledged receipt of the Election Notice, but rejected its efficacy.

44.    ICON and Hall demanded immediate return of the AUREALS held in the Kurtin Law digital wallet and demanded that Kurtin Law and Kurtin cease and desist from any further communications of any kind with the firms and persons approached with the prior and subsequent consent of ICON and Hall as prospective investors in one or more ICON Opportunities.  A copy of one such demand, dated September 29, 2025 is attached to this Complaint as Exhibit F.  The threats made by ICON and Hall to sue Kurtin Law, Kurtin, their counsel in this litigation, Olasov LLP, and their "principals" if any steps were taken to enforce plaintiffs' charging lien were wrongfully and improperly asserted in the face and in disregard of a careful and correct recitation of the applicable law provided in plaintiffs' Election Notice that ICON and Hall could readily have verified through counsel of their choosing.

45.    ICON and Hall disregarded the preference of Kurtin Law and Kurtin, communicated to defendants in writing, that the defendants turn over to lawyers of their choosing communications with plaintiffs and plaintiffs' counsel.

FIRST CLAIM FOR RELIEF
(Breach of Contract –Monetary Damages)

46.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 45 of this Complaint as if set forth herein in their entirety.

47.    Kurtin Law and Kurtin performed the services under the Engagement Letter, including without limitation the services identified and summarized in Paragraphs 14 through 32 of this Complaint in good faith.

48.     Kurtin Law and Kurtin performed the services under the Engagement Letter, including without limitation the services identified and summarized in Paragraphs 14 through 32 of this Complaint, with the expectation of compensation, in accordance with the terms of the Engagement Letter.

49.     Defendants ICON and Hall accepted the services performed by Kurtin Law and Kurtin under the Engagement Letter, including without limitation the services identified and summarized in Paragraphs 14 through 32 of this Complaint.

50.     In accepting the services performed by Kurtin Law and Kurtin under the Engagement Letter, including without limitation the services identified and summarized in Paragraphs 14 through 32 of this Complaint, ICON and Hall expressly acknowledged that the fees contemplated to be paid were materially in excess of fees that would be charged on a wholly-non-contingent basis. Hall stated that he had approved of the arrangement under the Engagement Letter that called for some compensation to be on a contingent basis because he had wanted Kurtin Law and Kurtin to have "skin in the game."

51.     Under the Engagement Letter, Kurtin Law and Kurtin had "skin in the game," as Hall desired.

52.     As of Monday, October 13, 2025, thebusiness day immediately preceding the filing of this Complaint, the value of the 460.49 AUREALS provided for in the Engagement Letter as the retainer had a redemption value in U.S. dollars of US$60,821.52 at the market rate of US$132.08 per gram of gold.

53.     The ICON Transactions subject to the Success Fee, assuming the consummation of each at a full distribution, had a face value of not less than US$3,348,000,000.

54.     The Success Fee under the Engagement Letter called for Kurtin Law and Kurtin to receive as compensation 1% of the net proceeds or capital raised from each ICON Transaction.

ICON's exercise of a termination right has the consequence under applicable New York law of converting the contingent payment of compensation into the right of Kurtin Law and Kurtin in their discretion to be compensated under the Engagement Letter on a non-contingent basis. Plaintiffs communicated to defendants their election to be compensated on a non-contingent basis by the September 25, 2025 Election Notice, attached as Exhibit F.

55.    While Hall repeatedly expressed high levels of confidence that the ICON Transactions on which Kurtin Law and Kurtin were working could be consummated in large if not full measure, and identified existing prospective investors, discovery and expert testimony will be required to create an adequate record on which his enthusiasm can be evaluated. Most of the funds to be raised were for the purpose of acquiring gold bullion to support the minting, or issuance, of AUREALS as cryptocurrency.

56.    For their part Kurtin Law and Kurtin accepted the engagement to provide legal services under the Engagement Letter in the strong conviction that the proposed offerings of AUREALS as a stable cryptocurrency pegged to grams of gold and supported by inventories of gold in amounts to underpin minted AUREALS was truly innovative and that, subject to sufficient funding and capitalization, ICON and Hall were suitably positioned to implement their market strategy, and become an important cryptocurrency enterprise with the potential to compete with the U.S. dollar itself as the "reserve" currency in which international transactions were funded.

57.    Hall has acted on the foregoing premise underlying the willingness of Kurtin Law and Kurtin to become engaged with ICON and Hall by promoting the AUREAL and its promise in public fora around the world.

58.    Kurtin Law and Kurtin are entitled to the reasonable value of their services under the Engagement Letter in amounts to be proved at trial, but believed to be greatly in excess of the diversity of citizenship jurisdictional threshold.

59.    By reason of the foregoing, Kurtin Law and Kurtin are entitled to judgment against defendants ICON and Hall, jointly and severally, for the reasonable value of all their services under the Engagement Letter, together with such other relief, including interest and attorneys' fees, as may be just and proper.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Redemption of Retainer)

60.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 59 of this Complaint as if set forth herein in their entirety.

61.    By breaching their contractual obligations timely to convert the AUREAL retainer, defendants should be required to convert the AUREALS into dollars at the higher of their value as of the commencement of this action and the date on which the conversion is made in order to place on the defendants all risk of market changes in the value of gold from their breach.

62.    By reason of the foregoing, Kurtin Law and Kurtin are entitled to judgment against defendants ICON and Hall, jointly and severally, directing them to take all steps necessary or convenient to cause the retainer of 460.49 AUREALS to be converted into U.S. dollars immediately available to plaintiffs, together with such other injunctive, declaratory or monetary relief, including interest and attorneys' fees as may be just and proper.

## THIRD CLAIM FOR RELIEF
### (Imposition of Constructive Trust)

63.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 62 of this Complaint as if set forth herein in their entirety.

64.    Under the Engagement Letter ICON and Hall expressly agreed to the direct payment of Kurtin Law and Kurtin from the closing proceeds of ICON Transactions, as follows:

> YOU FURTHER AGREE, PRIOR TO ANY CLOSING OR CLOSINGS TO EXECUTE ANY DOCUMENTS REASONABLY NECESSARY TO THE PURCHASER, ESCROW AGENT, OR OTHER STAKEHOLDER'S SATISFACTION TO ALLOW

SUCH PERSON OR ENTITY TO PAY THE SUCCESS FEE TO
US AT ANY SUCH CLOSING OR CLOSINGS FROM THE
CLOSING PROCEEDS (Engagement Letter p. 2, CAPS in original)

65.    Kurtin Law and Kurtin have no information whether ICON and Hall have closed
or are imminently about to close all or part of any ICON Transactions within the scope of the
Engagement Letter either within or outside of the jurisdiction of the United States.  In order to
protect the plaintiffs' interests under the Engagement Letter, a constructive trust should be imposed
on the proceeds of any such Transactions.

66.    Kurtin Law and Kurtin have a confidential or fiduciary relationship with ICON and
Hall.

67.    ICON and Hall expressly promised that Kurtin Law and Kurtin would be directly
compensated by the purchaser, escrow agent or other funding stakeholder in any Transaction
within the scope of the Engagement Letter, under which Kurtin Law and Kurtin have vested rights
of compensation, notwithstanding ICON and Hall's termination.

68.    In reliance on such promises Kurtin Law and Kurtin performed legal services from
which ICON and Hall have benefited and would be unjustly enriched, were they to continue to try
to elude payment for such services to Kurtin Law and Kurtin.

69.    Kurtin Law and Kurtin did not undertake the performance of legal services for
ICON and Hall in contemplation that they might be forced to chase ICON and Hall all over the
world to collect their fees.

70.    By reason of the foregoing, Kurtin Law and Kurtin are entitled to a decree of this
Court imposing a constructive trust on the proceeds of ICON Transactions within the scope of the
Engagement Letter either within or outside of the jurisdiction of the United States.

FOURTH CLAIM FOR RELIEF
(Judicial Protection of Charging Lien)

71.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 70 of this Complaint as if set forth herein in their entirety.

72.    Plaintiffs Kurtin Law and Kurtin have a charging lien under common law and under NY Judiciary Law against the proceeds of ICON Transactions within the scope of the Engagement Letter either within or outside of the jurisdiction of the United States.

73.    ICON and Hall have wrongfully interfered with the charging lien held by Kurtin Law and Kurtin by threatening to sue them and their lawyers for "tortious interference" and "defamation" if they take any steps to enforce the lien, remarkably even as to firms and persons introduced by Kurtin himself to ICON and Hall.

74.    In order to protect their charging lien, this Court should grant relief authorizing the giving of notice to all prospective investors in ICON Transactions within the scope of the Engagement Letter previously identified by plaintiffs or defendants or disclosed in discovery as having been identified by defendants or those acting in concert with them.

FIFTH CLAIM FOR RELIEF
(Declaratory Judgment)

75.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 74 of this Complaint as if set forth herein in their entirety.

76.    This Court has jurisdiction under 28 U.S.C.§2201 to grant a declaratory judgment declaring the rights and obligations of the parties under the Engagement Letter.

77.    There is an actual controversy between the parties.

78.    The Court should grant plaintiffs a declaratory judgment declaring their right to compensation in respect of proposed, pending or consummated ICON Transactions within the

scope of the Engagement Letter on which plaintiffs had been engaged and working prior to defendants' termination on September 16, 2025.

79.    Under F. R. Civ. Pro. Rule 57 plaintiffs are entitled to declaratory relief even if other relief may be available.


PRAYER FOR RELIEF

WHEREFORE, plaintiffs KURTIN PLLC and OWEN D. KURTIN demand judgment against defendants ICON CAPITAL RESERVE S.A. and J. BRADLEY HALL, jointly and severally, as follows:

(i)    On the first claim for relief, granting money damages in breach of contract measured in *quantum meruit* in accordance with the terms of the Engagement Letter for the services performed by Kurtin Law and Kurtin for the benefit of ICON and Hall; in such amounts as may be proved at trial;

(ii)    On the second claim for relief, granting plaintiffs Kurtin Law and Kurtin affirmative injunctive relief directing defendants ICON and Hall, jointly and severally, to take all steps necessary or convenient to cause the retainer of 460.49 AUREALS to be converted into U.S. dollars at the higher of their value at the commencement of this action and at the time of conversionand made immediately available to plaintiffs;

(iii)    On the third claim for relief, imposing a constructive trust on the proceeds of all proposed, pending or consummated ICON Transactions within the scope of the Engagement Letter on which plaintiffs had been engaged and working prior to defendants' termination on September 16, 2025 whether such ICON Transactions are to be consummated within or outside of the jurisdiction of the United States, and declaring that ICON, Hall and all persons acting in concert

with them hold such proceeds in constructive trust for plaintiffs Kurtin Law and Kurtin, to the extent of their interests under the Engagement Letter;

(iv)    On the fourth claim for relief, authorizing plaintiffs to give written notice to all prospective investors in ICON Transactions within the scope of the Engagement Letter previously identified by plaintiffs or defendants or disclosed in discovery as having been identified by defendants or those acting in concert with them, of the existence of the charging lien held by plaintiffs, in such form and by such means of communication as this Court may approve, and granting such other related and incidental relief as may be just and proper;

(v)    On the fifth claim for relief, declaring the rights of plaintiffs to compensation in respect of proposed, pending or consummated ICON Transactions within the scope of the Engagement Letter on which plaintiffs had been engaged and working prior to defendants' termination on September 16, 2025;

(vi)    On the first, second and third claims for relief, awarding interest in such amounts and for such periods as may be just and proper;

(vii)    On all claims for relief, awarding plaintiffs reasonable attorneys' fees

(viii)    On all claims for relief, awarding plaintiffs the costs and disbursements of this action; and

(ix)    Granting such other, further or different relief as may be just and proper.

Dated: Brooklyn, New York
      October 14, 2025

OLASOV, LLP

By: /s/  David M. Olasov
      David M. Olasov
(A Member of the Firm)

104 East 16th Street
Brooklyn, New York 11226
dolasov@olasov.com
917-214-8740

Attorneys for Plaintiffs Kurtin PLLC

and Owen D. Kurtin